UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DANA A. McCANN | ) | |
| | ) | |
| v. | ) | No. 3:03-0462 |
| | ) | Judge Wiseman |
| JO ANNE B. BARNHART, | ) | Magistrate Judge Griffin |
| Commissioner of Social Security. | ) | |

To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action, pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration denying the plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") as provided by the Social Security Act.

The plaintiff filed applications for DIB and SSI in early 2000 (Tr. 106-08, 368-70). She alleged a disability onset date of July of 1997 in her application for DIB (Tr. 106-120), and an onset date of December 31, 1997, in her application for SSI (Tr. 368-70). The plaintiff's applications were denied initially (Tr. 87-91), and upon reconsideration (Tr. 96-99, 371-78). A hearing was held before an Administrative Law Judge ("ALJ") on June 5, 2002 (Tr. 27-82), and on December 12, 2002, the ALJ found that the plaintiff was not disabled within the meaning of the Social Security Act (Tr. 15-22). According to the ALJ and apparently not disputed by the parties, the plaintiff alleges that she is disabled as a result of residual vision effects of possible pseudotumor cerebri, depression, and foot problems. (Tr. 16). At the hearing, the plaintiff amended the disability onset

date to February 25, 1999. (Tr. 31). This decision became the final decision of the Commissioner when the Appeals Council ("AC") denied the plaintiff's request for review. (Tr. 8-9).

Pending before the Court is the plaintiff's motion for judgment on pleadings or administrative record (Docket Entry No. 12), and the defendant's motion for judgment on the administrative record (Docket Entry No. 14).

## I. STATEMENT OF FACTS

The plaintiff was born on March 8, 1970, making her almost 29 years old at the time of the alleged onset date. (Tr. 106). She received a GED in 1988, a Florida manicurist license in 2000, and a Tennessee manicurist license in 2002. (Tr. 32, 48, 118). The ALJ found her past relevant work to be a manicurist, salesperson, personal service attendant, house cleaner, and dining room attendant. (Tr. 21).

On February 3, 1999, the plaintiff saw Lynn Stubbs, CCSW, at Family Services in Raleigh, North Carolina. (Tr. 186). The plaintiff reported significant symptoms of depression and anxiety, related to her losing full custody of her son. (Tr. 186). She described having a "depressed mood nearly every day, decreased interest in activities, difficulty sleeping, feelings of worthlessness and hopelessness, and vague suicidal ideation." (Tr. 187). Based on the plaintiff's report, Ms. Stubbs diagnosed the plaintiff with major recurrent, depressive disorder,

2

and gave the plaintiff a GAF of 62.[1] Ms. Stubbs also reported that the plaintiff's goals were to increase and obtain regular time with her son, return to work, and rebuild her self-esteem and confidence as a parent. (Tr. 188).

On February 23, 1999, Dr. Duncan McEwen, a psychiatrist with Family Services, examined the plaintiff, who reported a long history of depressive symptoms with no prior treatment. (Tr. 189).[2] In his psychiatric evaluation, Dr. McEwen noted that the plaintiff's judgment and insight appeared within normal limits, and that she had "no significant medical problems." (Id.) Dr. McEwen prescribed Remerol. (Tr. 190).

An eye examination dated March 23, 1999, revealed that the plaintiff had a mild elevation of her right optic nerve. (Tr. 212). On March 23, 1999, Dr. Stephen Gupton, Jr., a neurologist, noted that the plaintiff's "[v]isual field was full [and that] the discs on the right appeared somewhat blurred." (Tr. 181). Dr. Gupton reported that he "supposed" a pseudotumor was possible, and scheduled the plaintiff for an MRI scan of her brain. (Tr. 182). On March 28, 1999, the MRI of the plaintiff's head was found to be negative. (Tr. 183). Although the plaintiff saw Dr. Gupton three separate times over the course of the next three months (Tr. 179, 178, 177), he did not provide any diagnosis for the plaintiff. (Id.)

---

[1] A GAF of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning (e.g., occasional truancy or theft within household), but generally functioning pretty well, with some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 34 (4th ed. 2000).

[2] However, Ms. Stubbs reported that the plaintiff had previously received therapy at Family Services in 1993 and 1994. (Tr. 187). In fact, Dr. McEwen had previously evaluated the plaintiff in 1994. (Tr. 194-95).

On July 23, 1999, the plaintiff began treatment at the Baldwin County Mental Health Center, in Bay Minette, Alabama, where she was diagnosed with "major depressive disorder, single episode severe with panic attacks," and "personality disorder [not otherwise specified with] dependent features." (Tr. 225). She was assigned a GAF score of 50[3] (Tr. 225), and was prescribed Trazodone and Prozac (Tr. 222). The plaintiff returned to the Baldwin County Mental Health Center on February 25, 2000, where she reported "some breakthrough panic attacks and anxiety symptoms . . . excessive worrying [and] preoccupational fears." (Tr. 220). Dr. William M. Cseh increased the amount of her Prozac prescription to 60 mg. (Id.)

On January 20, 2000, Lawrence J. Gilgun, a licensed psychologist, conducted a psychological examination of the plaintiff. (Tr. 226-29). He diagnosed "Major Depressive Disorder, recurrent, moderate, Panic Disorder without agoraphobia, [and] mixed personality disorder." (Tr. 229). He found the plaintiff to have a GAF of 60. (Id.)

During April and May of 2000, the plaintiff visited a number of doctors due to her eye problems. On April 18, 2000, Dr. Culbertson, a neurologist, found that the plaintiff had papilledema, and suspected that she had pseudotumor cerebri. (Tr. 216). On April 28, 2000, Dr. David T. Casey diagnosed probable papilledema. (Tr. 230). On May 24, 2000, Kenneth A. Gregg, O.D., noted mild papilledema in the right eye. (Tr. 210). Finally, on May 29, 2000, Dr. Culbertson opined that the plaintiff's papilledema was questionable, and that it was more likely pseudopapilledema. (Tr. 214).

---

[3]A GAF of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 34 (4th ed. 2000).

4

On September 4, 2000, Dr. Charles H. Smith, a psychiatrist, completed a disability evaluation as requested by the Mobile (Alabama) Division of Disability Determination. (Tr. 235-38). Dr. Smith found that the plaintiff had "vocational potential" (Tr. 236), and was "stable and employable" (Tr. 238).

On September 19, 2000, Donald E. Hunter, a non-examining DDS psychologist, found the plaintiff to be moderately limited in the following areas: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; and the ability to interact appropriately with the general public. (Tr. 239-40). He also noted that the plaintiff had a slight restriction in the activities of daily living, moderate difficulties in maintaining social functioning, and often had deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere). (Tr. 250).

On January 22, 2001, the plaintiff was seen at the Matthew Walker Comprehensive Health Center. (Tr. 296-97). She was assessed as having "depression/anxiety" and it was noted that she had been suicidal during the previous two months. (Tr. 297). On February 8, 2001, G. Frieden, a non-examining DDS employee, found that the plaintiff had an affective disorder, anxiety-related disorder, and a personality disorder, which caused a mild restriction in the activity of daily living, and moderate difficulties in social functioning and maintaining concentration. (Tr. 261, 271).

On May 3, 2001, the plaintiff visited the Murfreesboro Guidance Center of the Volunteer Behavioral Health Care System, where she reported symptoms of anxiety and depression. (Tr. 355). A therapist diagnosed her with "major depressive disorder, single episode, severe without psychotic features," and assigned a GAF score of 41. (Id.)

5

Case 3:03-cv-00462   Document 16   Filed 06/30/05   Page 5 of 18 PageID #: 5

On May 21, 2001, Dr. Sabitha S. Hudek of the Guidance Center conducted a psychiatric evaluation. (Tr. 285-88). Dr. Hudek noted that the plaintiff had a depressed mood and was tearful several times during the interview when talking about her son (Tr. 287). During the examination, the plaintiff admitted to occasional passive suicidal ideations, but denied any plans or intent. (Id.) Dr. Hudek diagnosed the plaintiff as having "major depression, recurrent, with psychotic features; panic disorder, with agoraphobia; and obsessive-compulsive disorder." (Tr. 288). Dr. Hudek assigned the plaintiff a current GAF of 50, highest GAF in past year of 60, and a lowest GAF in past year of 40. (Id.) She also increased the plaintiff's Zoloft to 150 mg. a day. (Id.)

During a June 18, 2001, visit to Dr. Hudek, the plaintiff reported a slight improvement (Tr. 283). Her crying spells were better, she was not as depressed, and her energy levels were somewhat better. (Id.) However, she still had anxiety and mood swings, ate excessively, and was uncomfortable around people. (Id.) Dr. Hudek noted that the plaintiff's mood and affect were anxious and that her range of affect was broad. (Id.) She increased the plaintiff's dosage of Zoloft to 200 mg. a day and started the plaintiff on Topamax, at 25 mg. a day. (Tr. 284).

On July 16, 2001, the plaintiff saw Dr. Hudek again. (Tr. 281-82). She noted the plaintiff's subdued affect and auditory hallucinations. (Tr. 281). Dr. Hudek reported that the plaintiff stated that after taking the increased dosage of Zoloft, her "crying spells, depression, energy levels, and obsessive-compulsive symptoms [were] much better." (Id.) In addition, the plaintiff reported that her mood swings had improved with Topamax, but that she still had anxiety and jaw clenching. (Id.) Also, the plaintiff continued to hear her son*s voice. (Id.) Dr. Hudek assigned a GAF score of 70, added Seroquel 25 mg. twice a day to help with the hallucinations, and increased Topamax to 100 mg. twice a day, while continuing Zoloft at 100 mg. twice every morning. (Tr. 281-82).

6

On August 28, 2001, Dr. Hudek saw the plaintiff again and found that she had an exaggerated startle response and auditory hallucinations, but that she was less anxious. (Tr. 279). Dr. Hudek prescribed Zoloft 100 mg. twice every morning, Topamax 100 mg. twice a day and two capsules of Seroquel 25 mg. twice a day, and again assigned the plaintiff with a GAF score of 70. (Tr. 279-80).

On October 3, 2001, Dr. Thomas Privett, a neurologist, examined the plaintiff due to her complaints of headaches and eye pain. (Tr. 305). Dr. Privett noted equivocal findings of decreased medial border of the optic disc, with his assessment being "common migraine headaches." (Tr. 302).

On November 12, 2001, Dr. Hudek filled out a medical source statement of the plaintiff's ability to do work-related activities, and a questionnaire. (Tr. 290-95). Dr. Hudek reported that the plaintiff had poor/no ability to relate to coworkers, deal with the public, interact with supervisors, deal with work stresses and maintain attention/concentration, behave in an emotionally stable manner and relate predictably in social situations, and poor/no ability to understand both complex and detailed job instructions. (Tr. 290-91). She also reported that the plaintiff had anhedonia, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, thoughts of suicide and hallucinations, and delusions or paranoid thinking. (Tr. 293). In addition, Dr. Hudek reported that the plaintiff had recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom, which occurred on the average of at least once a week. (Tr. 293). Dr. Hudek noted that the plaintiff had recurrent obsessions or compulsions and recurrent and intrusive recollections of a traumatic experience, which were sources of marked distress. (Tr. 293—294). These impairments resulted in marked restrictions

7

in the activities of daily living, social functioning and maintaining concentration. (Tr. 294). Dr. Hudek diagnosed the plaintiff as having "major depression, rec[urrent], with psychotic features, panic disorder with agoraphobia, post-traumatic stress disorder and obsessive compulsive disorder." (Tr. 295).

On November 20, 2001, Dr. Hudek examined the plaintiff again. (Tr. 347-49). During the examination, the plaintiff reported being unable to increase the dosages of Seroquel because it made her drowsy. (Tr. 348). She also reported having anxiety, periods of depression with hopelessness, and occasional panic attacks. (Id.) Dr. Hudek prescribed Zoloft 200 mg. a day, Topamax 100 mg. a day and Seroquel 50 mg. a day, and again diagnosed the plaintiff as having major depressive disorder, recurrent, severe with psychotic features, mood-congruent, panic disorder with agoraphobia, and obsessive-compulsive disorder. (Tr. 348-49). She also assigned the plaintiff a GAF score of 50, with a highest GAF score of 60 in the past year. (Tr. 349).[4] That day, the plaintiff also returned to Dr. Privett for a follow-up about her headaches. (Tr. 300). At this visit she had "no major change in her headache pattern and no complaints of visual fields deficits." (Id.) Dr. Privett assessed common migraine headaches, possibility of pseudotumor cerebri, anxiety, and depression. (Id.).

On December 4, 2001, the plaintiff was examined by Dr. Harold Akin, an ophthalmologist. (Tr. 357). Dr. Akin reported that the plaintiff*s visual field loss had a functional basis, and was not due to a pseudotumor or other occult optic nerve or central lesion causes. (Id.) He also noted that sometimes patients on psychotropic medications experience generalized field depression. (Id.)

---

[4] However, on July 16, 2001, and August 28, 2001, Dr. Hudek had assigned a GAF of 70. (Tr. 280-81).

8

On January 15, 2002, Dr. Hudek examined the plaintiff again. (Tr. 343-46). Dr. Hudek noted the plaintiff's short-term memory was impaired and referred her to intensive outpatient therapy. (Tr. 344). Although her diagnoses remained unchanged, Dr. Hudek found the plaintiff to have a GAF score of 41. (Tr. 345).

On February 6, 2002, Dr. Hudek examined the plaintiff again. (Tr. 337). Dr. Hudek noted that the plaintiff's affect was less anxious. (Tr. 338). The plaintiff reported having low energy levels and anxiety, but also related that she had learned some coping skills in a counseling program she was attending. (Tr. 337-38). Dr. Hudek assigned the plaintiff with a GAF score of 41, and diagnosed the plaintiff with major depression, recurrent, with psychotic features, panic disorder with agoraphobia, obsessive compulsive disorder, and post-traumatic stress disorder. (Tr. 339).

On February 6, 2002, the Intensive Outpatient Program (IOP) at the Guidance Center in Murfreesboro, Tennessee, identified the plaintiff's problems as "anxious mood, obsessive thoughts, worries with panic attacks, and poor coping skills to manage mental illness." (Tr. 336).

On February 28, 2002, a Clinically Related Group (CRG) form completed at the Guidance Center indicated that the plaintiff had marked restrictions in activities of daily living and adaptation to change. (Tr. 332-33). In addition, she had moderate restrictions in interpersonal functioning and concentration, task performance and pace (Tr. 332-33), and was considered a person with a severe illness (Tr. 334). Her GAF was 55,[5] highest 60 and lowest 40 in the previous six months. (Tr. 334).

---

[5]A GAF of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). <u>Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)</u>, 34 (4th ed. 2000).

On March 6, 2002, the plaintiff was discharged from the IOP at the Guidance Center after attending sessions three days a week for six weeks and actively participating in treatment and meeting all treatment goals. (Tr. 328-29). On March 6, 2002, Dr. Hudek examined the plaintiff, who reported that her anxiety and depression were "better but still there." (Tr. 324-25). Dr. Hudek assigned a GAF score of 60 and increased the Effexor to 150 mg. twice a day, and prescribed Topamax 100 mg. twice a day, Seroquel 75 mg. and Zoloft 100 mg. twice a day (Tr. 325-26).

On March 7, 2002, the plaintiff met with Cheryl Mann, a therapist. The plaintiff reported crying spells, feelings of worthlessness, grief over losing her son, panic, and feeling conspicuous and inferior to others in public. (Tr. 321). Ms. Mann and the plaintiff developed a treatment plan, the goals of which were to recognize early warning signs of panic attacks and effectively minimize the effects of anxiety. (Tr. 322). The plaintiff was also instructed to report and demonstrate improved mood (Tr. 322). Her current GAF score was 60. (Tr. 322).

On March 18, 2002, in a therapy session with Ms. Mann, the plaintiff reported her five significant stressors and Ms. Mann reported that the plaintiff "utilizes affirmations and attempts to reframe the situation more positively, but usually remains withdrawn and immobile." (Tr. 319). On May 6, 2002, the plaintiff met with Ms. Mann, who reported that the plaintiff was "overwhelmed with stressors (SSI, dental needs) as well as ongoing guilt and self-recrimination regarding her son." (Tr. 309).

On June 5, 2002, a hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 27-82). At the hearing, the plaintiff testified that, while she received her Tennessee manicurist license in January of 2002, she cried "the whole time" she took her test. (Tr. 37). In addition, the plaintiff testified that in January of 2002, she wanted to "hang [herself] in [her] back yard," and that she had

been suicidal for around three years. (Tr. 43). Also at the hearing, a Vocational Expert ("VE") testified that, based on Dr. Hudek's November 12, 2001, assessment (Tr. 290-95), there would be no jobs available for the plaintiff. (Tr. 79-80). The VE testified that the plaintiff's testimony regarding her "intensity of pain, intermittent loss of vision, forgetfulness, [and] unpredictable crying spells," was consistent with Dr. Hudek's assessment (Tr. 290-95). (Tr. 80).

## II. DISCUSSION

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether or not the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. §§ 405(g) and 1382(c)(3); Richardson v. Perales, 402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Gibson v. Secretary of Health, Education & Welfare, 678 F.2d 653 (6th Cir. 1982). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the Court might have decided the case differently based on substantial evidence to the contrary. Her v. Commissioner of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999). A reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984). Substantial evidence means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. It is more than a mere scintilla of evidence. Richardson, supra; Le Master v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Court must accept the ALJ's explicit findings and determination unless the record, as a whole, is without substantial

11

evidence to support the ALJ's determination. Houston v. Secretary of Health & Human Servs., 736 F.2d 365, 366 (6th Cir. 1984); Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir. 1978).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. The five steps are as follows: (1) If claimant is doing substantial gainful activity, she is not disabled; (2) If claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled; (3) If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry; (4) If claimant's impairment does not prevent her from doing her past relevant work, she is not disabled; (5) Even if claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates his residual functional capacity ("RFC") and vocational factors, such as age, education, and past work experience, she is not disabled.[6] See 20 C.F.R. § 404.1520. See also Tyra v. Secretary of Health & Human Servs., 896 F.2d 1024, 1028-29 (6th Cir. 1990); Farris v. Secretary of Health & Human Servs., 773 F.2d 85, 88-89 (6th Cir. 1985); Mowery v. Heckler, 771 F.2d 966, 969-70 (6th Cir. 1985); Houston, supra.

The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. Id. See 42 U.S.C. § 1382c(a)(3)(C); 20 C.F.R. §§ 404.1512 (a), (c), 404.1513(d); Landsaw v. Secretary of Health & Human Servs., 803 F.2d 211, 214 (6th Cir. 1986); Tyra, 896 F.2d at 1028-29. However,

---

[6]This latter factor is considered regardless of whether such work exists in the immediate area in which plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if he applied. Ragan v. Finch, 435 F.2d 239, 241 (6th Cir. 1970).

12

the Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 432(d)(2)(C); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. Allen v. Califano, 613 F.2d 139, 145 (6th Cir. 1980); Hephner, supra. To rebut a *prima facie* case, the Commissioner must come forward with particularized proof of the plaintiff's individual vocational qualifications to perform specific jobs. O'Banner v. Secretary of Health, Education & Welfare, 587 F.2d 321 (6th Cir. 1978).

Analyzing the evaluation process at step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since February 25, 1999. (Tr. 16). At step two, the ALJ determined the evidence established that the plaintiff had residual effects of possible pseudotumor cerebri, as well as depression, and that they constituted severe impairments. (Tr. 18). At step three, the ALJ found that the medical evidence in the record did not indicate that the plaintiff had any impairment that met the criteria of any of the listed impairments in 20 C.F.R. Part 404, Subpart P. Appendix 1. (Id.) At step four, the ALJ determined that the plaintiff could perform past relevant work. (Tr. 20). Therefore, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act, and was not entitled to DIB or SSI benefits. (Tr. 27).

The ALJ erred in failing to give controlling weight
to the treating psychiatrist*'s assessment

If a treating source's opinion on the issue of the nature and severity of a plaintiff's impairment is well supported by medically acceptable clinical techniques and not inconsistent with

13

the other evidence of record, then it will be given controlling weight. 20 C.F.R. § 404.1527(d)(2).

The plaintiff argues that the ALJ improperly rejected the opinion of Dr. Hudek, the plaintiff's treating physician, who, on numerous occasions, diagnosed the plaintiff as having major depression, recurrent, with psychotic features, panic disorder, with agoraphobia, and obsessive-compulsive disorder. See Docket Entry No. 13, at 17. The plaintiff also argues that the ALJ did not give proper deference to Dr. Hudek's finding that she was unable to deal with the public. Id. at 24.

The first time Dr. Hudek assessed the plaintiff as being unable to work was on November 12, 2001, when Dr. Hudek filled out a medical source statement of the plaintiff's ability to do work-related activities, and a questionnaire. (Tr. 290-95). Dr. Hudek reported that the plaintiff had poor/no ability to relate to coworkers, deal with the public, interact with supervisors, deal with work stresses and maintain attention/concentration, behave in an emotionally stable manner and relate predictably in social situations, and poor/no ability to understand both complex and detailed job instructions. (Tr. 290-91). She also reported that the plaintiff had anhedonia, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, thoughts of suicide and hallucinations, and delusions or paranoid thinking. (Tr. 293).

In addition, Dr. Hudek reported that the plaintiff had recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom, which occurred on the average of at least once a week. (Tr. 293). Dr. Hudek noted that the plaintiff had recurrent obsessions or compulsions and recurrent and intrusive recollections of a traumatic experience, which were sources of marked distress. (Tr. 293—294). These impairments resulted in marked restrictions in the activities of daily living, social functioning

14

and maintaining concentration. (Tr. 294). Dr. Hudek diagnosed the plaintiff as having "major depression, rec[urrent], with psychotic features, panic disorder with agoraphobia, post-traumatic stress disorder and obsessive compulsive disorder." (Tr. 295).

The ALJ found that the assessments of Dr. Hudek are not entitled to great weight because they are not supported by the weight of the objective medical evidence. (Tr. 19). The ALJ made the following findings to support his conclusion: (1) "[t]he other mental health treatment notes contained in the record do not suggest that the [plaintiff] suffered from dire or debilitating mental conditions," (2) "[w]ith very rare exceptions, the GAF scores assessed during the [plaintiff's] therapy were in the 55 to 60 range," (3) "[n]o state medical examiner has indicated that the [plaintiff's] mental impairments are severe enough to preclude her from sustaining employment," and (4) "the [plaintiff's] therapist indicated that work would be good for her." (Id.)

While there are records dated before May 21, 2001, that provide substantial evidence upon which to base the denial of benefits, the Court finds that the ALJ erred in failing to give controlling weight to the treating psychiatrist*s assessments, beginning on November 12, 2001, when Dr. Hudek opined that the plaintiff was unable to work. (Tr. 290-95). The Court further finds that the bases for the ALJ's conclusion are incorrect.[7]

First, "other mental health treatment notes" do, in fact, recognize that the plaintiff suffered from dire and debilitating mental conditions. For instance, on February 3, 1999, Lynn Stubbs, CCSW, diagnosed the plaintiff with major recurrent, depressive disorder, and gave the plaintiff a

---

[7]The Court does, however, agree with the ALJ that there is substantial evidence that the plaintiff's foot conditions are not severe and do not meet the durational requirement. The Court further finds that the record does not support a finding of disability based on the plaintiff's impairment due to possible pseudotumor cerebri.

15

GAF of 62. (Tr. 186-88). On July 23, 1999, the plaintiff began treatment at the Baldwin County Mental Health Center, in Bay Minette, Alabama, where she was diagnosed with "major depressive disorder, single episode severe with panic attacks," and "personality disorder [not otherwise specified with] dependent features." (Tr. 225). She was assigned a GAF score of 50 (Tr. 225), and was prescribed Trazodone and Prozac (Tr. 222). On January 20, 2000, Lawrence J. Gilgun, a licensed psychologist, conducted a psychological examination of the plaintiff. (Tr. 226-29). He diagnosed "Major Depressive Disorder, recurrent, moderate, Panic Disorder without agoraphobia, [and] mixed personality disorder." (Tr. 229).

Second, the ALJ's conclusion that, "with very rare exceptions," the plaintiff's GAF scores were between 55 and 60, is incorrect. The plaintiff was given GAF scores lower than 55 on eight different occasions. (Tr. 225, 288, 330, 340, 341, 345, 349, 355). Of those assessments, three of the GAF scores were 41. (Tr. 340, 345, 355).

Third, after May 21, 2001, the first time the plaintiff visited Dr. Hudek, there are no records from any other treating physicians, whether treating or consulting physicians, that are contrary to Dr. Hudek's assessments. The only record to the contrary after May 21, 2001, is a May 1, 2002, notation by a social worker, working with Dr. Hudek at the Guidance Center, who found that work would be ". . . something productive and pleasurable [for the plaintiff] to do rather than dwelling on [things] she can't control." (Tr. 19, 310). The Court finds that this one notation, made by Nancy Doman, a social worker, not a psychiatrist, is not sufficient to permit the ALJ to accord Dr. Hudek's assessments with less than controlling weight.[8]

---

[8]Cheryl Neal, a social worker who saw the plaintiff nine times (Tr. 306-09, 313-21), in comparison to the three times Ms. Doman saw the plaintiff, never suggested that the plaintiff should go out and find work.

16

The ALJ found that "a review of [the plaintiff's] daily living does not suggest that she is debilitated to the point of being unable to work," and that "[i]t is noteworthy that [the plaintiff] did complete a vocational training program and [that] she [completed] a test needed to qualify for a professional license." (Tr. 20). He also rejected "[a]ll self-reported symptoms and limitations inconsistent with a residual functional capacity." (Id.) However, he made these findings after improperly rejecting the assessments of Dr. Hudek (Tr. 19). As previously noted, the VE testified that, based on Dr. Hudek's November 12, 2001, assessment (Tr. 290-95), there would be no jobs available for the plaintiff. (Tr. 79-80). He further testified that the plaintiff's testimony regarding her "intensity of pain, intermittent loss of vision, forgetfulness, [and] unpredictable crying spells," was consistent with Dr. Hudek's assessment (Tr. 290-95). (Tr. 80). Therefore, the Court finds that substantial evidence does not support the ALJ's finding that the plaintiff is not disabled.

### III. RECOMMENDATION

For the reasons stated above, the Court respectfully recommends that the plaintiff's motion (Docket Entry No. 12) be GRANTED in part, the defendant's motion for judgment on the administrative record (Docket Entry No. 14) be DENIED in part, the decision of the ALJ be REVERSED in part, and the plaintiff be awarded DIB benefits[9] as of November 12, 2001, when Dr. Hudek completed her medical source statement and questionnaire.[10]

---

[9] The ALJ found that the plaintiff was insured for disability benefits through March 31, 2002. (Tr. 16). The plaintiff began receiving SSI benefits effective January 22, 2003. Docket Entry No. 13, at 1.

[10] There would be no purpose in remanding this case to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g) because all factual issues have been resolved and the record "adequately establishes" the plaintiff's entitlement to benefits. Faucher v. Secretary of Health and Human

17

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of receipt of this notice, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

                                             /s/ Juliet Griffin
                                             JULIET GRIFFIN
                                             United States Magistrate Judge

---

Servs., 17 F.3d 171, 176 (6th Cir. 1994). See Vansickle v. Commissioner of Social Security, 277 F. Supp. 2d 727, 732-33 (E.D. Mich. 2003).